UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

**Hon. Hugh B. Scott**

**12CR214S**

v.

**Report
&
Recommendation**

ROBERT QUINTANA,

Defendant.

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(C)

(Docket No. 13).  The instant matter before the Court is an omnibus motion of defendant (Docket

No. 94) seeking various forms of relief.  Considered in this Report are defendant's motion to

dismiss the Superseding Indictment (Docket No. 86) on four different grounds, including

dismissal on facial insufficiency; to dismiss the single mail fraud count in the original Indictment

(Docket No. 12) with prejudice; to suppress statements under the Fifth Amendment; and to

suppress evidence under the Fourth Amendment (Docket No. 94).  Here, he seeks to suppress his

statement (id., Ex. C; see also Docket No. 158, Mar. 20, 2017, Tr. at 15-17, Def. Ex. 1).  The

nondispositive relief sought in this motion is considered in a separate Order (Docket No. 173).

Under the original Indictment (Docket No. 12), defendant moved for various relief

including dismissal of that Indictment; suppression of statements for violation of defendant's

rights as recognized in Miranda v. Arizona, 384 U.S. 436 (1966), and his employment and self-

incrimination rights under <u>Garrity v. New Jersey</u>, 385 U.S. 493 (1967); suppression of evidence for violation of his Fourth Amendment rights; and other discovery and non-dispositive relief (Docket No. 32).  Upon the filing of the Superseding Indictment (Docket No. 86), defendant filed the pending omnibus motion (Docket No. 94).

Pursuant to this Court's schedule (<u>see</u> Docket No. 92), the Government furnished a responding Memorandum (Docket No. 95) to this Motion, and defendant replied (Docket No. 99) focusing on the dispositive aspects of the omnibus motion.  This motion was argued on October 7, 2015, with the Government conceding that a hearing was in order (Docket No. 100, minute entry).  That hearing was scheduled (<u>id.</u>) and subsequently rescheduled after various fits and starts (<u>e.g.</u>, Docket Nos. 102, 114, 127).  The hearing eventually was commenced on October 27, 2016 (Docket Nos. 132 (minutes), 134 (transcript)), and was continued on March 8, 2017 (Docket Nos. 154 (minutes of hearing), 156 (transcript)[1]; March 20, 2017 (Docket Nos. 155 (minutes of hearing), 158 (transcript); May 8, 2017 (Docket Nos. 159 (minutes of hearing), 164 (transcript)); and June 1, 2017 (Docket Nos. 163 (minutes of hearing), 165 (transcript)).  After filing of the last transcripts on July 18, 2017 (Docket Nos. 164, 165), post-hearing briefing initially was due thirty days from that filing (Docket No. 163), on August 17, 2017, but that deadline was extended to August 24, 2017 (Docket Nos. 167, 168; <u>see</u> Docket No. 166, motion for extension of time).  Post-hearing oral argument was held on September 28, 2017 (Docket Nos. 171 (Order setting argument), 172 (minutes)), and the motion was submitted.

---

[1]<u>See also</u> Docket Nos. 144-45 (minutes and notice scheduling hearing for earlier date), 147-48 (Order and notice resetting hearing).

# BACKGROUND

*Original Indictment (Docket No. 12)*

Defendant originally was charged, in June 29, 2012, in a single count Indictment with mail fraud, in violation of 18 U.S.C. § 1341 (Docket No. 12).  Defendant, a Buffalo Police officer in 2012, claimed injured on duty (or "IOD") status on March 16, 2005, from the department and the Buffalo Police Department placed him on that status at full pay (id. ¶¶ 9, 8). Subsequent independent medical examinations (or "IMEs") of defendant in 2006, 2007, and 2011 found that he could perform limited light duty with the Police Department (id. ¶¶ 10-12). The City following each examination requested that defendant return to light duty (id.) but defendant remained on IOD status (id. ¶ 13).  The alleged fraud essentially was defendant accepting IOD salary and benefits from the City of Buffalo by exaggerating his physical disabilities while defendant was able to work at other employment (id. ¶¶ 14-15).  Defendant also failed to inform the City that he was working while on IOD status at the Niagara Café (id. ¶ 16).

*Superseding Indictment (Docket No. 86) and Present Motion (Docket No. 94)*

As noted above, defendant eventually moved (among other relief) to suppress his statements and to dismiss the Indictment (Docket No. 32).  This motion was argued, on May 21, 2014 (Docket No. 56), and a suppression hearing was scheduled (id.) and then repeatedly rescheduled (Docket Nos. 57-77, 78-85) but eventually not held.  For on May 15, 2015, the Grand Jury issued a Superseding Indictment (Docket No. 86), which charged defendant with 46 counts of wire fraud, in violation of 18 U.S.C. § 1343, for each wire transmission of deposits from the City of Buffalo into defendant's bank accounts paying him salary from July 2010 to

April 2013 (id.).  Again, the fraud alleged was that defendant exaggerated his physical condition in order to retain IOD salary (see id.).  The Superseding Indictment did not reassert the mail fraud charge of the original Indictment (or an allegation that defendant caused a check to be mailed from the City's Department of Audit and Control to Urban Family Planning Practice, Docket No. 12, Indict. ¶ 18).  The Government has not formally moved to dismiss the initial mail fraud count (see also Docket No. 94, Def. Atty. Decl. ¶ 1).

At the arraignment on the Superseding Indictment, defendant pled not guilty to the new charges and was instructed to consider whether the Superseding Indictment rendered any previously filed motions moot (Docket No. 92, Minutes of June 3, 2015, proceedings).  Defendant then filed the pending new omnibus motion (Docket No. 94), seeking (again among other relief) suppression of his statements.  The Government responded (Docket No. 95) and defendant filed reply papers (Docket No. 99).  Oral argument was held on October 7, 2015.  As discussed above, an evidentiary hearing was held over a series of dates from October 2016 to July 2017 (Docket Nos. 134, 156, 158, 165, 132, 154, 155, 159, 163).  Post-hearing briefing was submitted (Docket Nos. 169 (Government), 170 (defense)), and the motion was argued on September 28, 2017 (Docket No. 172).

*Article 78 Proceedings*

Prior to and in parallel to this prosecution, defendant sought an administrative hearing to challenge the independent medical examinations conclusion that he was fit for light work (see Docket No. 94, Def. Atty. Decl. ¶¶ 5-7).  The hearing officer upheld the IME's findings (id. ¶ 7).  Defendant next sought relief in an Article 78 proceeding (commenced as the Grand Jury indicted him, see id.), wherein the New York State Supreme Court Appellate Division, Fourth

4

Department, upheld the hearing officer's determination (id.), Matter of Quintana v. City of Buffalo, 114 A.D.3d 1222, 1224, 979 N.Y.S.2d 760, 762 (4th Dep't) (hearing officer's determination was supported by substantial evidence), leave to appeal denied, 23 N.Y.3d 902, 987 N.Y.S.2d 2 (2014). Defendant stresses that there was no allegation of fraud or misrepresentation made in the state court (id.).

*Evidentiary Hearing*

This motion and case arises from execution of an arrest warrant upon defendant on May 9, 2012 (Docket No. 134, Oct. 27, 2016, Tr. at 7). Prior to the hearing, defendant moved for production of the FBI memorandum for the arrest and questioning of defendant (Docket No. 129) and this was denied (Docket No. 131).

The Court reviewed the transcripts of the evidentiary hearing conducted in October 2016 to July 2017 (Docket Nos. 134, 156, 158, 164, 165[2]), the parties' respective motions and post-hearing submissions (Docket Nos. 169, 170), including the Government's proposed findings of fact (Docket No. 169), and the parties arguments on September 28, 2017 (Docket No. 172).

Defendant joined the Buffalo Police Department in 1988 (Docket No. 165, June 1, 2017, Tr. at 14), and later he served as a member of the City of Buffalo Common Council (id. at 41). On March 16, 2005, defendant was injured on duty, suffering a disabling injury, and defendant received IOD benefits from that date (id. at 15). Defendant subsequently retired from the

---

[2]Unfortunately, these transcripts were not consecutively paginated. Therefore, references will be to the dated transcript and page in that document.

Buffalo Police Department (id. at 15; Docket No. 170, Def. Post-Hearing Memo. at 2) on

May 30, 2014 (Docket No 169, Gov't Memo. at 8).

Defendant contends that two issues are in dispute (1) whether defendant was informed

immediately about the arrest warrant or two hours later after he had spoken to agents, and

(2) whether defendant was advised of his Miranda rights at the beginning of the interview or two

hours later at its conclusion (Docket No. 170, Def. Post-Hearing Memo. at 2). Defendant argues

that one Federal Bureau of Investigation ("FBI") agent, Thomas Provost, testified that he took

notes during the interview but lost them prior to the hearing (id.; Docket No. 156, Mar. 8, 2017,

Tr. at 22). Another FBI agent, David Budz, testified that he could not recall any details of the

interview (Docket No. 158, Mar. 20, 2017, Tr. at 7-20; Docket No. 170, Def. Post-Hearing

Memo. at 2).

*Witnesses*

The Government called two witnesses, FBI special agent Provost and Buffalo Police

Lieutenant Richard Ortiz (Docket Nos. 134, 156). Both were present during the May 9, 2012,

arrest (Docket No. 134, Oct. 27, 2016, Tr. at 12; Docket No. 156, Mar. 8, 2017, Tr. at 25), with

Provost as the lead agent on this investigation (Docket No. 134, Oct. 27, 2016, Tr. at 4-5).

Lieutenant Ortiz was in the Internal Affairs Division (or "IAD") of the police department

(Docket No. 156, Mar. 8, 2017, Tr. at 55-56) and was present during defendant's arrest and

interview as a liaison with the FBI (id. at 56-57; Docket No. 170, Def. Post-Hearing Memo. at

4).

Defendant called as witnesses other agents and Buffalo Police Department officers

present during this arrest (Docket No. 170, Def. Post-Hearing Memo. at 4, 5; Docket No. 134,

Oct. 27, 2016, Tr. at 12 (Provost testifying); Docket No. 158, Mar. 20, 2017, Tr. at 50 (Allan

Rains), 64, 63 (Steven Halter)).  Defendant also testified on his behalf (Docket No. 165, June 1,

2017, Tr. at 14-61).

Also from the Buffalo Police Department's IAD was Captain Kent (Docket No. 164,

May 8, 2017, Tr. at 4, 7; Docket No. 170, Def. Post-Hearing Memo. at 5).  Then-Deputy

Commissioner Charles Tomaszewski, the second ranking officer in the department, was present

during the interview to report to the Police Commissioner (Docket No. 165, June 1, 2017, Tr. at

9; Docket No. 170, Def. Post-Hearing Memo. at 5).

*Agents' Entry and Defendant's Pain Medication*

This Court issued an arrest warrant for defendant on May 7, 2012, two days prior to its

execution (Docket No. 139, Gov't Memo. at 4; Docket No. 8, Arrest Warrant).

Defendant argues that the officers arrived "with robust force" (Docket No. 170, Def.

Post-Hearing Memo. at 4).  The Buffalo Police officers wore holstered arms and were in uniform

and the FBI agents wore "FBI"-labeled windbreakers (id.; Docket No 156, Mar. 8, 2017, Tr. at

68; Docket No. 158, Mar. 20, 2017, Tr. at 51; Docket No. 165, June 1, 2017, Tr. at 8; Docket

No. 164, May 8, 2017, at 7).  Officers were positioned outside of defendant's home and parked

in his driveway (Docket No. 170, Def. Post-Hearing Memo. at 9; Docket No. 165, June 1, 2017,

Tr. at 17, 33-34; Docket No. 158, Mar. 20, 2017, Tr. at 33, 72 (Halter)).

The agents and officers arrived at 7 am and knocked at defendant's door (Docket

No. 134, Oct. 27, 2016, Tr. at 7; Docket No. 158, Mar. 20, 2017, Tr. at 50, 67; Docket No. 170,

Def. Post-Hearing Memo. at 4).  Defendant answered the door wearing only boxer briefs and a

t-shirt, appearing sleepy (Docket No. 134, Oct. 27, 2016, Tr. at 7; Docket No. 156, Mar. 8, 2017, Tr. at 31, 58; Docket No. 165, June 1, 2017, Tr. at 15, 17, 23; Docket No. 170, Def. Post-Hearing Memo. at 4, 8-9). Defendant attributes this drowsiness to the pain medication he was taking, that it made him like a "zombie" (Docket No. 156, Mar. 8, 2017, Tr. at 42; Docket No. 170, Def. Post-Hearing Memo. at 7). He claimed that he slept through the time for his scheduled morning dosage of pain medication (Docket No. 165, June 1, 2017, Tr. at 16; Docket No. 170, Def. Post-Hearing Memo. at 8), testifying that he felt dizzy and woozy since he missed his scheduled dosage by about an hour (Docket No. 170, Def. Post-Hearing Memo. at 10-11; Docket No. 165, June 1, 2017, Tr. at 28-29).

Provost never asked if defendant was affected by his pain medication (Docket No. 156, Mar. 8, 2017, Tr. at 45), whether he could proceed with the interview despite first needing the morning dose and after receiving it (Docket No 170, Def. Post-Hearing Memo. at 7). Provost testified that he attributed defendant's grogginess to being just awakened (Docket No. 134, Oct. 27, 2016, Tr. at 11; Docket No. 156, Mar. 8, 2017, Tr. at 45; Docket No. 170, Def. Post-Hearing Memo. at 7). During the questioning, defendant took his overdue pain medication (Docket No. 169, Gov't Memo. at 8; Docket No. 134, Oct. 27, 2016, Tr. at 14 (Provost); Docket No. 165, June 1, 2017, Tr. at 15-16 (defendant)). The Government contends that defendant's demeanor was unchanged after taking that medication (Docket No. 169, Gov't Memo. at 8; <u>see</u> Docket No. 134, Oct. 27, 2016, Tr. at 11, 14-15; Docket No. 156, Mar. 8, 2017, Tr. at 58). Defendant, however, argues that (at least at the start of the interview, before his morning dosage), he appeared to feel like a zombie due to his pain medication (Docket No. 156, Mar. 8, 2017, Tr. at 42; Docket No. 170, Def. Post-Hearing Memo. at 7).

8

*Interview*

Defendant asked if he could be allowed to get dressed and the agents agreed (Docket

No. 134, Oct. 27, 2016, Tr. at 7; Docket No. 169, Gov't Memo. at 7).  At the start of the

interview and prior to defendant dressing, agents asked if he would talk with them, and

defendant agreed (Docket No. 134, Oct. 27, 2016, Tr. at 7; Docket No. 169, Gov't Memo. at 7

(while defendant was changing he was asked if he wanted to be interviewed)).  Defendant,

however, contends that he was in his boxers and t-shirt during the first fifteen minutes of the

interview and had to be escorted by an agent to his room to get dressed (Docket No. 170, Def.

Post-Hearing Memo. at 10; Docket No. 165, June 1, 2017, Tr. at 24-25).  After Provost claims

that he read from the Miranda card (Docket No. 134, Oct. 27, 2016, Tr. at 9-10 (Provost); Docket

No. 169, Gov't Memo. at 7), defendant then refused to sign written waivers (in English and

Spanish) of his rights (Docket No. 164, May 8, 2017, Tr. at 10-11 (Kent); Docket No. 156,

Mar. 8, 2017, Tr. at 38, 40-41 (Provost); Docket No. 170, Def. Post-Hearing Memo. at 6-7).

Based upon agent Budz's actions while defendant dressed, defendant began to suspect that he

was the target of the investigation (Docket No. 170, Def. Post-Hearing Memo. at 10; Docket No.

165, June 1, 2017, Tr. at 25-26).  Defendant entered his living room and Provost, Budz, Lt. Kent,

and Deputy Commissioner Tomaszewski followed (Docket No. 170, Def. Post-Hearing Memo.

at 9; Docket No. 165, June 1, 2017, Tr. at 18-19).

Defendant testified that first he was asked by Provost if he wanted to talk about Dr. Raul

Vazquez and defendant agreed (Docket No. 165, June 1, 2017, Tr. at 18-19, 20; Docket No. 170,

Def. Post-Hearing Memo. at 9).  Provost asked defendant to "wear a wire" the next time he

visited Dr. Vazquez, but defendant refused (Docket No. 170, Def. Post-Hearing Memo. at 10;

Docket No. 165, June 1, 2017, Tr. at 23). Defendant then returned to the living room and he claims that Provost became "combative" upon defendant's refusal to wear a recording device (Docket No. 165, June 1, 2017, Tr. at 26-27; Docket No. 170, Def. Post-Hearing Memo. at 10).

Defendant testified that Provost tried to cajole his cooperation with the Vazquez investigation by claiming that agents were next going to Dr. Vazquez and would tell him that defendant was working at the Niagara Café and had not refilled his prescriptions. Provost suggested that, once Dr. Vazquez learned of defendant's actions, Dr. Vazquez would change his opinion about defendant's disability status. (Docket No. 165, June 1, 2017, Tr. at 36-37; Docket No. 170, Def. Post-Hearing Memo. at 11.) Explaining the apparent missing refilled prescriptions, defendant told Provost that he used a different health insurer to pay for his prescription refill and that he would seek reimbursement from the City of Buffalo for the filled prescriptions (Docket No. 165, June 1, 2017, Tr. at 37-38; Docket No. 170, Def. Post-Hearing Memo. at 11). Despite these threats, defendant refused to wear a recording device (Docket No. 170, Def. Post-Hearing Memo. at 11).

It was at this point that defendant testified that Provost said that he had an arrest warrant for defendant if defendant refused to cooperate, presenting that warrant to defendant (Docket No. 165, June 1, 2017, Tr. at 32, 38; Docket No. 170, Def. Post-Hearing Memo. at 11). Defendant then invoked his right to counsel and, after being escorted to his bathroom, was advised of his Miranda rights, claiming that this was the first time agents advised him of his rights (Docket No. 170, Def. Post-Hearing Memo. at 11-12; Docket No. 165, June 1, 2017, Tr. at 38-40, 20, 22; see also Docket No. 170, Def. Post-Hearing Memo. at 9, 4 n.2).

10

*Miranda* Warning

Provost testified, however, that he informed defendant of the arrest warrant and advised defendant of his rights at the outset of the interview (Docket No. 134, Oct. 27, 2016, Tr. at 7, 9-10, Gov't Ex. 1 (copy of rights card); Docket No. 156, Mar. 8, 2017, Tr. at 31-32; Docket No. 164, May 8, 2017, Tr. at 9-10; Docket No. 169, Gov't Memo. at 7; Docket No. 170, Def. Post-Hearing Memo. at 4, 6). Provost and agent Budz interviewed defendant (Docket No. 156, Mar. 8, 2017, Tr. at 44 (Provost); Docket No. 158, Mar. 20, 2017, Tr. at 10 (Budz); Docket No. 170, Def. Post-Hearing Memo. at 5). Agents asked defendant if he would agree to cooperate in their investigation but defendant declined to say without the assistance of counsel, which Provost confirmed was defendant invoking his right to counsel (Docket No. 134, Oct. 27, 2016, Tr. at 15; Docket No. 169, Gov't Memo. at 8).

*Garrity* Issue

Defendant also denies being advised of his employment and self-incrimination rights under Garrity v. New Jersey, supra, 385 U.S. 493 (Docket No. 170, Def. Post-Hearing Memo. at 9). Defendant believed, based upon his training over twenty years with the Buffalo Police Department, he had to answer the federal investigators' questions and assist in their investigation. This belief was reinforced by the presence of an Internal Affairs Division officer and defendant's superior officer who were observing whether defendant cooperated. (Id. at 9-10, Docket No. 165, June 1, 2017, Tr. at 20, 21, 42-47.) Defendant feared losing his job if he failed to cooperate in this investigation (Docket No. 170, Def. Post-Hearing Memo. at 10; Docket No. 165, June 1, 2017, Tr. at 24). He points to testimony of the Buffalo Police officers that they did

11

not advise him of his rights as an employee under <u>Garrity</u> (Docket No. 164, May 8, 2017, Tr. at 10-11 (Kent)).

Provost acknowledged the presence of Buffalo Police Department internal affairs officers during the execution of the warrant and he told defendant that this involved a federal investigation and not a police department internal affairs investigation (Docket No. 134, Oct. 27, 2016, Tr. at 8; Docket No. 169, Gov't Memo. at 7; Docket No. 170, Def. Post-Hearing Memo. at 6). Provost explained that defendant could decline to cooperate with this federal investigation without affecting his employment with the Buffalo Police Department (Docket No. 134, Oct. 27, 2016, Tr. at 8-9; Docket No. 169, Gov't Memo. at 7). Provost said all of that while Buffalo Police officers (including members of Internal Affairs Division and defendant's superior officers) were present.

Defendant argues that Provost, as an FBI agent, lacked the authority to speak for the Buffalo Police Department regarding the employment consequences to defendant if he failed to cooperate with the federal investigation (Docket No. 170, Def. Post-Hearing Memo. at 6). Furthermore, the two Buffalo Police officials present during the interview did not say anything to confirm Provost's position, while a third Buffalo Police Department official, Lt. Ortiz, wandered around the house (<u>id.</u>) and did not participate in the interview.

*When Defendant Claims He Was Arrested*

Defendant contends that he was arrested by federal agents on 8:42 am, after almost two hours of questioning (Docket No. 170, Def. Post-Hearing Memo. at 8; Docket No. 158, Mar. 20, 2017, Tr. at 36 (Humphrey), 50 (Rains), 67 (Halter)). Defendant cites the testimony of agents Humphrey and Rains but they stated their limited role during the arrest. They claim that they

12

merely transported defendant from his home to the United States Courthouse for his arraignment (Docket No. 158, Mar. 20, 2017, Tr. at 44 (Humphrey), 55, 59 (Rains); Docket No. 170, Def. Post-Hearing Memo. at 8). They testified that they did not advise defendant of his rights (Docket No. 158, Mar. 20, 2017, Tr. at 44 (Humphrey testified that he did not recall advising defendant or recall Rains doing so), 55 (Rains denies reading defendant his rights); Docket No. 170, Def. Post-Hearing Memo. at 8). These agents testified that their sole role was transportation of defendant (Docket No. 158, Mar. 20, 2017, Tr. at 44, 55, 59).

Defendant concludes that he was questioned for almost two hours before being served with the arrest warrant or advised of his rights (Docket No. 170, Def. Post-Hearing Memo. at 12). He claims that his sequence of events—early morning arrival, the interview, arrest, advisement of rights over a nearly two hour period—was corroborated by the officers and agents who testified (id.; Docket No. 134, Oct. 17, 2016, Tr. at 7 (Provost); Docket No. 158, Mar. 20, 2017, Tr. at 36 (Humphrey, on time of arrest, 8:42, and departure at 8:48), 50 (Rains, at defendant's house from 7 am to 8:40 am), 67-68 (Halter, recalling agents entered on 7:05 am but not remembering when they left)). Agent Rains testified, however, that Halter never entered the house (Docket No. 158, Mar. 20, 2017, Tr. at 50). Agent Humphrey was only involved in transporting defendant (id., Tr. at 30, 43-44, 46, 33-34, 38, 45 (role not to interview defendant)) or to question defendant's wife (id., Tr. at 27, 34-35, 36, 40-42).

*Seizure*

Defendant contends that agents had free reign in his house during the nearly two hours of his interview. Agents moved about from the living room, kitchen, and bedroom after defendant and other occupants were secured. (Docket No. 170, Def. Post-Hearing Memo. at 5; see Docket

No. 156, Mar. 8, 2017, Tr. at 34, 67; Docket No. 158, Mar. 20, 2017, Tr. at 52, 56-57; Docket

No. 164, May 8, 2017, Tr. at 8.)  During the execution of the arrest warrant, agents seized three

prescription bottles (Docket No. 170, Def. Post-Hearing Memo. at 8; see Docket No. 165, June 1,

2017, Tr. at 13, Def. Ex. 4), with the medications later returned to defendant (Docket No. 170,

Def. Post-Hearing Memo. at 8).

      The Government initially denied that a search occurred (Docket No. 41, Gov't Memo. at

7; Docket No. 95, Gov't Memo. at 14).  Later, the Government disputed that the scope of

defendant's motion included suppression of any seized items (Docket No. 139, Gov't Memo. at

18; see Docket No. 134, Oct. 27, 2016, Tr. at 19).  The Government disclaims possessing any

items that could be suppressed (Docket No. 139, Gov't Memo. at 5).

## DISCUSSION

I.     Dismissal of Superseding Indictment

      Defendant initially contends that the Superseding Indictment should be dismissed on

three grounds:  (1) because it violates his First Amendment rights, (2) because it violates his

rights under the Equal Protection Clause of the Fourteenth Amendment (as applied by the Fifth

Amendment Due Process Clause), and (3) on federalism grounds (Docket No. 94, Def. Atty.

Decl. ¶¶ 9, 10-14, 15-18, 19-21).  Alternatively, he argues that the Superseding Indictment is

facially insufficient (id. ¶¶ 22-30).

     A.     Dismiss Superseding Indictment on First Amendment Grounds

      Defendant first argues that the Superseding Indictment should be dismissed because it

chills the exercise of his First Amendment right to seek redress and to grieve a disability finding

pursuant to a New York State Article 78 proceeding (Docket No. 94, Def. Atty. Decl. ¶¶ 9, 10-

14).  He argues that this prosecution chills the right to grieve civilly disability determinations in state court (id. ¶ 11).  As defendant admits (id. ¶¶ 5-7), however, he sought redress from the hearing finding that he could perform light duty work, including an appeal to the Fourth Department, while this prosecution was underway (see Docket No. 95, Gov't Memo. at 5-6). Defendant was not chilled in exercising his First Amendment right to seek redress administratively.  The fraud alleged in this prosecution is defendant's failure to inform examining doctors that he was also working at the Niagara Café during that period (Docket No. 86, Superseding Indict. ¶ 17).  This is distinct from his disagreement with the IME as to his fitness to return to some form of police duty, which he vindicated before a hearing officer and then in an Article 78 proceeding.  Again, as defendant notes (Docket No. 94, Def. Atty. Decl. ¶ 7), the Fourth Department upheld the hearing officer without reference to any fraud or misrepresentation argument, Matter of Quintana, supra, 114 A.D.3d at 1224, 979 N.Y.S.2d at 762.  Thus, this Superseding Indictment **should not be dismissed** due to any purported First Amendment chilling effect of the prosecution; defendant's motion (Docket No 94) on this ground should be **denied**.

      B.      Dismiss Superseding Indictment on Equal Protection Grounds

Defendant next argues that he is being selectively prosecuted while other police officers on IOD are not (Docket No. 94, Def. Atty. Decl. ¶¶ 15-18).  Defendant contends that he was selectively prosecuted as opposed to over 100 IOD officers, while some of those officers retired rather than face possible prosecution (id. ¶ 17).  He is being prosecuted only because he did not accept light duty (id. ¶ 18).

The Government responds that defendant's "illusory" selective prosecution claim is "completely baseless" (Docket No. 95, Gov't Response at 7). The Government argues that defendant fails to show a prosecutorial policy or that the policy had a discriminatory effect and was motivated by a discriminatory purpose (id. at 9, quoting Wayte v. United States, 470 U.S. 598, 608 (1985)).

For a selective prosecution contention, a defendant needs to show that "while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [the defendant], he has been singled out for prosecution" and the Government's discriminatory selection of him for prosecution has been invidious or in bad faith, based upon impermissible considerations as race, religion, or "the desire to prevent his exercise of constitutional rights," United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974) (Docket No. 94, Def. Atty. Decl. ¶ 16). The defendant bears a heavy burden of establishing a prima facie case of selective prosecution, id. The defendant also must demonstrate that the federal prosecutorial policy had a discriminatory effect and was motivated by a discriminatory purpose, United States v. Armstrong, 517 U.S. 456, 465 (1996) (quoting Wayte, supra, 470 U.S. at 608) (Docket No. 95, Gov't Response at 8).

Here, two officers on IOD duty, defendant and Patrick O'Mara, were prosecuted out of six officers originally investigated by the Federal Bureau of Investigation and the Buffalo Police Department (Docket No. 95, Gov't Response at 7), see United States v. O'Mara, 12CR215. Defendant has not shown a greater number of IOD officers could have been investigated or prosecuted for defrauding the City of Buffalo or shown a policy to target him or O'Mara for

failing to accept light duty.  Defendant's motion to dismiss the Superseding Indictment based on a violation of Equal Protection (Docket No. 94) should be **denied**.

      C.      Dismiss Superseding Indictment on Federalism Grounds

Defendant next argues that the Superseding Indictment should be dismissed on federalism principles (Docket No. 94, Def. Atty. Decl. ¶¶ 19-21).  Defendant states that this prosecution is based solely upon a construction of state law, whether (as he terms it) his "sporadic, unpaid volunteer activities at a family-owned restaurant are incompatible with his claim that he was unable to work a light-duty law enforcement position on a full-time basis" (id. ¶ 19, emphasis in original).  He argues that "the federal government does not have the right to unilaterally abrogate the State's standards for evaluating disability determinations under State law because that determination is solely within the State's authority" (id. ¶ 21).  The Government counters that this argument is without merit (Docket No. 95, Gov't Memo. at 10), that the Government is prosecuting fraud, with the underlying facts of IOD status defined by New York law (id.).

Whether defendant was properly on IOD status or whether he could perform any level of police work are fact questions ultimately for the jury to consider in determining whether defendant defrauded the City and committed wire fraud.  The fact that IOD status is a state law construct should not preclude a fraud prosecution if the other federal elements are established.  A defendant is guilty of 18 U.S.C. § 1343 wire fraud "if and only if he 'transmit[ted] or cause[d] to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice,'" United States v. Warme, No. 09CR19, 2010 U.S. Dist. LEXIS 1127, at *7

17

(W.D.N.Y. Jan. 7, 2010) (Arcara, J.). The scheme alleged here is defendant claiming IOD status when otherwise apparently able bodied; that leads to a construction of New York law regarding IOD status. A federal offense may be created in defrauding a state or local government, even though such a fraud would also violate state laws. This Court would not be abrogating state law here; instead, the factual question that would be posed to a jury is whether defendant violated state standards defining disability under IOD status. In all likelihood, the Government will call as witnesses Buffalo Police Department officials who would testify as to what conduct was deemed permissible for officers on IOD status, the activities or level of activity that constitutes "light duty," and whether defendant performed tasks that established that he no longer qualified for IOD status.

Defendant's motion (Docket No. 94) to dismiss the Superseding Indictment on federalism grounds should be **denied**.

D.      Dismiss Superseding Indictment for Facial Insufficiency

Alternatively, defendant argues that the Superseding Indictment should be dismissed due to facial insufficiency since that pleading does not allege requisite intent to commit wire fraud (or mail fraud, if the original count is considered, see discussion below) (Docket No. 94, Def. Atty. Decl. ¶¶ 22-30, 25). He claims that his actions were lawful under Buffalo Police Department regulations, hence cannot be the predicate for fraud (id. ¶ 25). The Government contends that defendant misstates the allegations; the Government charges that defendant exaggerated the extent of his disability to continue on IOD status and fraudulently collect IOD benefits while otherwise able bodied (Docket No. 95, Gov't Memo. at 11).

An Indictment that recites the elements of an offense informs the Court "of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had," United States v. Cruikshank, 92 U.S. 542, 558 (1876). The Indictment also needs to be specific enough for a defendant to prepare a defense to conform to the Sixth Amendment requirement that a defendant "be informed of the nature and cause of the accusation," U.S. Const. amend. VI. The Indictment also should sufficiently set forth the elements of the offense with adequate factual specificity to prevent a subsequent prosecution in violation of the Fifth Amendment double jeopardy clause. Gordon Mehler, John Gleeson, and David C. James, Federal Criminal Practice: A Second Circuit Handbook § 25-3, at 462 (17th ed. 2017) (hereinafter "Second Circuit Handbook").

The Superseding Indictment tracks the language of § 1343 in alleging each of the wire transfers from the City's account to defendant's account, each procured by the alleged fraud of defendant claiming IOD status without factual justification. The narrative paragraphs of the Superseding Indictment alleges in detail the scheme wherein defendant claimed IOD status and received salary and benefits from the City while working a second job at Niagara Café (Docket No. 86, Superseding Indict. ¶ 16). The Superseding Indictment charges that as part of the scheme defendant failed to inform the Buffalo Police Department and physicians evaluating him for his disability that he was working a second job at the Niagara Café (Docket No. 86, Superseding Indict. ¶¶ 16-17). It then charges that defendant transmitted or caused to be transmitted, by means of wire communications in interstate commerce, the electronic payments of his salary from the City's payroll account to defendant's bank account (id. ¶ 18). Thus, the elements of the offense of wire fraud have been sufficiently alleged by the facts and underlying

19

law for this Court to determine the sufficiency of a conviction under this Indictment and to inform defendant to allow him to prepare a defense. The Superseding Indictment is sufficiently specific in alleging in particular the fraud elements of the offense that prevent defendant from facing double jeopardy if a new Indictment is filed. It also sufficiently alleges defendant's intent to defraud by exaggerating his condition to retain benefits he did not deserve.

Defendant's motion to dismiss the Superseding Indictment (Docket No. 94) on the ground of facial insufficiency should be **denied**.

  E.  In Summary, Dismissal of Superseding Indictment

For the reasons stated above, defendant's motion to dismiss the Superseding Indictment (Docket No. 94) should be **denied** on the several grounds raised by defendant.

II. Dismiss Mail Fraud Count in Original Indictment

Defendant next contends that, by filing the Superseding Indictment, the single count for mail fraud in the original Indictment should be dismissed with prejudice (Docket No. 94, Def. Atty. Decl. ¶¶ 31-32). The Government concedes that since the Superseding Indictment did not allege mail fraud that this count is no longer before this Court and the Government has no intention to refile the mail fraud charge (Docket No. 95, Gov't Response at 13). The mail fraud count, however, has not been formally dismissed.

Dismissal of an Indictment may be with our without prejudice to reprosecution. In the Speedy Trial Act, 18 U.S.C. § 3161, context, a dismissal may be with prejudice if several factors are considered: the seriousness of the offense, the circumstances that compelled dismissal; the effect of reprosecution on the administration of justice and on the Speedy Trial Act; and prejudice to the defendant, United States v. Taylor, 487 U.S. 326, 334 (1988); Second Circuit

Handbook, supra, § 43-3, at 1033.  A dismissal without prejudice still has the effect of compelling the Government to seek a new Superseding Indictment if it wishes to pursue the dismissed charges and "exposes the prosecution to dismissal on statute of limitations grounds," Taylor, supra, 487 U.S. at 342.

Defendant argues that the filing of the Superseding Indictment should be deemed the Government's motion to dismiss the charges in the original Indictment (Docket No. 94, Def. Atty. Decl. ¶ 31), see United States v. Kelly, 45 F.3d 45, 48 (2d Cir. 1995) (per curiam) (Speedy Trial Act and Superseding Indictment).  The United States Court of Appeals for the Second Circuit, however, has held that a Superseding Indictment does not extinguish the original Indictment, United States v. Hertular, 562 F.3d 433, 450 (2d Cir. 2009) (allowing for close to trial filing of Superseding Indictment, citing United States v. Vavlitis, 9 F.3d 206, 209 (1st Cir. 1993)); see Second Circuit Handbook, supra, § 25-10, at 480.  In Vavlitis, the First Circuit held that both the original and Superseding Indictments "remained valid until the district court granted the government's motion to dismiss the superseding indictment," 9 F.3d at 209.  Thus, technically, the mail fraud charge remains.

The Government's present position in effect seeks to abandon the mail fraud charge with no intention to refile (Docket No. 95, Gov't Response at 13) but formally it has not moved to dismiss the initial Indictment or consented to its dismissal on this defense motion.  At a minimum, all sides agree that the mail fraud charge will not be pursued.  The Government does not comment on whether dismissal of that charge should be with or without prejudice.  If reprosecuted, the Government may face a statute of limitation issue to reassert in 2017 (or later) a charge of fraudulent mailing allegedly conducted in 2011, see 18 U.S.C. §§ 1341, 3282(a) (5-

21

year statute of limitations for mail fraud). Given the age of this case and the shifted focus from

the single medical payment in 2011 (with payment of defendant's salary) by mail to payment of

defendant's salary from 2010-12 by wire transfer, defendant would be prejudiced if the mail

fraud charge remains or is revived. Furthermore, the alleged manner in which defendant

received his salary while on IOD status (that is, whether by wire transfer rather than by mail) led

to the superseding of the Indictment.

Defendant's motion to dismiss the sole count of the initial Indictment (Docket No. 12)

charging mail fraud should be **granted with prejudice**. Even if this dismissal were without

prejudice (and the Government were to change its position and later seek to indict defendant

again on mail fraud), a Grand Jury would have to be convinced that the mailing at issue was

timely within the limitations period.

III.    Suppression of Statements under Fifth Amendment and <u>Miranda</u>

Defendant contends that he was not advised of his rights under <u>Miranda</u> prior to making

his statements during the FBI interview (<u>see</u> Docket No. 32, Def. Atty. Decl. ¶¶ 15-24, Ex. B,

Aff. of defendant; <u>see</u> Docket No. 94, Def. Atty. Decl. Ex. C). Under the Fifth Amendment,

defendant argues that his statements made to officers on May 9, 2012, should be suppressed

(Docket No. 94, Def. Atty. Decl. ¶ 33, Ex. C (copy of defendant's statement)). The Government

counters that defendant was advised of his rights, he had waived them by agreeing to conduct the

interview, and the presence of at least one Buffalo Police Department internal affairs officer did

not invalidate defendant's waiver of his <u>Miranda</u> rights (<u>e.g.</u>, Docket No. 95, Gov't Memo. at

13).

As reduced by defendant, the two issues in dispute are when defendant was informed about the arrest warrant and whether he was advised of his Miranda rights at the beginning of the interview or almost two hours later as he contends (Docket No. 170, Def. Post-Hearing Memo. at 2). Given his employment by the Buffalo Police Department, a third issue is whether any statements he made were coerced by the threat to his continued employment.

Defendant was clearly in custody when the interview began. The Government does not dispute that defendant was not free to leave (see Docket No. 165, June 1, 2017, Tr. at 23 (defendant felt that he "absolutely" did not have the right to leave, and was dressed only in boxers and t-shirt at the start of the interview)). Agents were in and outside of defendant's house. They controlled entry and exit from the property (allowing defendant's wife and daughter to leave to allow the daughter to get to school, but telling them to keep the investigation confidential, Docket No. 170, Def. Post-Hearing Memo. at 8; Docket No. 134, Oct. 27, 2016, Tr. at 12 (Provost); Docket No. 156, Mar. 8, 2017, Tr. at 50 (Provost)).

As defendant noted in his initial Motion (Docket No. 32, Def. Atty. Decl. ¶ 14; see Docket No. 94, Def. Atty. Decl. ¶ 33 (adopting this argument in the pending Motion)), under Miranda, supra, 384 U.S. at 479, the Fifth and Fourteenth Amendments' prohibition against self-incrimination "required that custodial interrogation be preceded by advice to the defendant that he has the right to remain silent and to the presence of counsel" (id.). To warrant suppression, the statements had to have been made in custody, without a suspect being advised of his rights to remain silent or await counsel, and without the suspect knowingly and voluntarily waiving those rights. The interrogation should be any words or actions "that the police should know are

23

reasonably likely to elicit an incriminating response," Rhode Is. v. Innis, 446 U.S. 291, 301 (1980).

The voluntariness of a statement in this circumstance is determined by review of the totality of the circumstances, looking at the suspect's age, level of education, whether the Miranda warning was given, the length of detention, the nature of the interrogation, and use of physical punishment, the suspect's mental vulnerability, United States v. Siddiqui, 699 F.3d 690, 707 (2d Cir. 2012), and his prior experience with the criminal justice system, United States v. Watson, 423 U.S. 411, 424-25 n.14 (1976) (Docket No. 169, Gov't Memo. at 18; see also Docket No. 170, Def. Post-Hearing Memo. at 20-21).

A.    When Did Defendant Learned of the Arrest Warrant?

The parties differ as to when defendant learned that he was under arrest or was served with the arrest warrant. Agent Provost said he informed defendant at the outset that he was under arrest. Provost later testified that, when Mrs. Quintana was allowed to leave during the interview of her husband (about within an hour of the interview, see Docket No. 165, June 1, 2017, Tr. at 30-31, 35 to 40 minutes into interview, defendant's daughter tried to leave her room, eventually allowed to leave with her mother), she was told not to reveal that defendant was under arrest (Docket No. 156, Mar. 8, 2017, Tr. at 49-50). Defendant, however, contends that he was arrested and shown the arrest warrant only after almost two hours of questioning and attempts to cajole him into wearing a recording device when he next met with Dr. Vazquez (Docket No. 165, June 1, 2017, Tr. at 38). Defendant testified that near the end, Provost said that if defendant did not cooperate in wearing the recorder, then Provost was going to enforce the arrest warrant he had in his pocket (id.), at which time defendant sought counsel (id.).

24

Defendant, a police officer on May 2012, was well familiar with Miranda warnings (see id., Tr. at 42), see, e.g., United States v. Gallo, No. 3:99CR111AWT, 2000 WL 852453, at *7 (D. Conn. Apr. 13, 2000) (defendant's "training and experience as a police officer" demonstrated his familiarity with Miranda rights); United States v. DiLorenzo, No. S1 94 Cr. 303 (AGS), 1995 WL 366377, at *5 (S.D.N.Y. June 19, 1995) (defendant's 9–year experience as a police officer made him "uniquely familiar" with Miranda rights); United States v. Funderburk, 492 F. Supp. 2d 223, 270 (W.D.N.Y. 2006) (Foschio, Mag. J.) (Amended Report & Rec.), adopted, id., at 228 (W.D.N.Y. 2007) (Arcara, Ch. J.).  He invoked his right later in the interview to not cooperate or continue speaking with the officers without the advice of counsel.

Regardless of when in the sequence of events defendant was shown or served with the arrest warrant, under these circumstances defendant was in custody during the entirety of the interview.  Defendant was not free to leave.  Other family members required permission of the agents to go, admonished not to reveal defendant's arrest.  The number and location of the agents and officers clearly establish that defendant was not free to leave.  His freedom of movement within his own house was restricted; he had to be accompanied by an agent in order to change or to get his medication.

B.    When Was Defendant Advised of His Rights?

Defendant also argues that he was advised of his rights only after he was placed under arrest, about two hours after the agents and police officials arrived.  He emphatically denied being advised of his rights sooner (Docket No. 165, June 1, 2017, Tr. at 20), stating that he was read his rights by an approximately 30-year-old agent after defendant was handcuffed (id. at 39).

From the FBI's report of the arrest, the FD-302 report, agents Provost and Budz recorded that defendant was arrested at his home, with the agents arriving there at 7:05 am (Docket No. 94, Ex. C, at 1). After defendant got dressed, defendant was informed that an arrest warrant was issued against him to arrest him for health care fraud and mail fraud arising from his IOD status (id.). Defendant then indicated that he was willing to be interviewed (id.). Provost wrote that he then advised defendant of his Miranda rights from an advice of rights form FD-395a (id.; see Docket No. 134, Oct. 27, 2016, Tr., at 9-10, Gov't Ex. 1). Defendant "acknowledged that he understood his rights and was willing to speak with" the agents without a lawyer present (Docket No. 94, Ex. C, at 1). Defendant then rendered his statement and the agents sought defendant's cooperation in investigating Dr. Vazquez (id. at 1-3). As the interview proceeded, defendant indicated that he wanted to cooperate with the Vazquez inquiry but defendant wanted his attorney present first; the agents asked if defendant was invoking his right to counsel at that time and defendant said that he was (id. at 3). According to the FBI report, the interview then was terminated and defendant was handcuffed and transported to federal Court (id.).

Thus, from the near contemporaneous (recorded May 15, 2012, from the May 9, 2012, arrest, id.; see Docket No. 169, Gov't Memo. at 14) statement, defendant was advised of the arrest warrant and his Miranda rights early in the interview. While defendant agreed to proceed with the interview before being advised formally of his rights, according to the report he was soon advised of those rights and was advised before he rendered his statement that he seeks suppressed.

Agent Provost testified consistent with this report. Agent Budz, however, did not recall the interview and had his recollection refreshed with that report (Docket No. 158, Mar. 20, 2017,

Tr. at 9-17, admitting report as Budz's past recollection recorded, at 17-20, Budz's limited recall, 20; see also Docket No. 169, Gov't Memo. at 14 n.3).  Defendant's version of the interview put the service of the arrest warrant and advice of rights near the end of the almost two hour of questioning.

The Government argues that defendant was Mirandized early in the interview and that he voluntarily answered their questions and then voluntarily refused to cooperate with the investigation (Docket No. 169, Gov't Memo. at 1-2, 4; Docket No. 95, Gov't Memo. at 13).  It discounts defendant's recollection based upon defendant's state during the initial portion of the interview, admittedly groggy from just waking up and under the effects of pain medication coupled with the passage of time from May 2012 to June 2017 when defendant testified (Docket No. 169, Gov't Memo. at 15-17).  The Government would have this Court note defendant's condition just before and after he had taken his medication, since defendant also took medication during his June 1, 2017, testimony (id. at 16; Docket No. 165, June 1, 2017, Tr. at 53 (defendant admitting that taking Suboxone did not interfere with his ability to understand and testify)).  The Government disputes defendant's claimed incoherence in his affidavit as compared with his latter testimony (Docket No. 169, Gov't Memo. at 17).

Thus, the timing question is one of credibility between defendant and agent Provost.  This Court, however, need not reach the question if the interview turned out not to be an "interrogation" for Miranda purposes.  Also, if timely informed of his right, defendant could waive his rights and voluntarily make his statements.

1.    Is This an "Interrogation"?

Miranda applies when questioning is deemed an interrogation, Innis, supra, 446 U.S. at 301. "Interrogation" in this context is both express questioning as well as its "functional equivalent," including "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the subject," Innis, supra, 446 U.S. at 300-01 (emphasis added).

Here, agents asked defendant whether he would cooperate in investigating his doctor, Dr. Vazquez, including wearing a concealed recording device. The agents did not ask questions or seek to elicit statements from defendant; instead, they asked if defendant would cooperate or not. The agents approached defendant as if they knew what offenses he committed and did not need him to make an incriminating statement. There is no allegation here that these agents used deception or trickery to obtain defendant's statements. These agents intended to arrest defendant (if necessary) but they first sought his cooperation in the Vazquez investigation. The actual target of police inquiry appears to have been Dr. Vazquez. If any coercion existed here, it was to compel defendant's cooperation in the Vazquez investigation and not to incriminate himself.

Agents can discuss the value of cooperating with the authorities with a suspect without vitiating the voluntariness of that suspect's statement, see Funderburk, supra, 492 F. Supp. 2d at 272; United States v. Newton, No. 11-CR-50, 2012 WL 170008, at *5 (D. Vt. Jan. 19, 2012) (citing cases). The cases with suspect cooperation usually involve agents stating that this suspect's cooperation would help that party's situation, e.g., United States v. Montana, 958 F.2d 516, 518-19 (2d Cir. 1993); but cf. United States v. Guido, 704 F.2d 675, 677 (2d Cir. 1983) (denying proposition that discussion of cooperation is inherently a form of questioning for

28

Miranda purposes), or used the opportunity to cooperate as a way to entice the suspect to incriminate herself, e.g., Campaneria v. Reid, 891 F.2d 1014, 1021 (2d Cir. 1989); United States v. Plugh, 576 F.3d 135, 144 (2d Cir. 2009), rev'd on reconsideration on other grounds, 648 F.3d 118 (2d Cir. 2011). The statement that the suspect could help herself by cooperating in these cases is an indirect way to elicit statements from the suspect, United States v. Ortiz, 943 F. Supp. 2d 447, 462 (S.D.N.Y. 2013) (discussing offer of cooperation made in Plugh, supra, 576 F.2d at 138, 144-45). The cooperation was not to help in the investigation of a third party.

As was held in Guido, supra, 704 F.2d at 677, "there is no indication that the agents' conduct was 'designed to elicit an incriminating response,'" (quoting Innis, supra, 446 U.S. at 302 n.7). Here, the agents were not questioning defendant; rather, they sought his cooperation in an investigation of another party. The agents believed they had enough evidence against defendant—his working while on IOD status—such that it was not required to elicit incriminating statements from him. While the threat of prosecution against defendant remained if he did not cooperate, the agents did not seek his statements regarding defendant's culpability. This does not constitute express questioning or its functional equivalent, Innis, supra, 446 U.S. at 300, which would make this interview an interrogation, since the only thing sought was defendant's cooperation against Dr. Vazquez and not any admission or statement from defendant. The interview here, therefore, was **not an interrogation requiring a prior advice of rights** under Miranda or Innis. Thus, the timing of when defendant here was advised of his rights is **not material**.

2.    Voluntary Statement

If, however, viewed as a custodial interrogation, an accused may waive his or her rights,

Edwards v. Arizona, 451 U.S. 477, 482 (1981); Miranda, supra, 384 U.S. at 444; Funderburk,

supra, 492 F. Supp. 2d at 270 (Amended Report & Rec.).  As discussed by Magistrate Judge

Foschio in Funderburk,

> "In making this determination, the court considers whether the purported waiver
> was voluntary and constituted "a knowing and intelligent relinquishment or
> abandonment of a known right or privilege, a matter which depends in each case
> upon the particular facts and circumstances surrounding that case including the
> background, experience and conduct of the accused." (internal quotation omitted).
> Edwards, 451 U.S. at 482 (citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).
> "Thus, the determination whether statements obtained during custodial
> interrogation are admissible is to be made upon an inquiry into the totality of the
> circumstances surrounding the interrogation, to ascertain whether the accused in
> fact knowingly and voluntarily decided to forgo his rights to remain silent and to
> have the assistance of counsel." Fare v. Michael C., 442 U.S. 707, 724–25 (1979).

Funderburk, supra, 492 F. Supp. 2d at 270.

Defendant's waiver of his rights was voluntary despite his use of pain medication and

feeling dizzy and groggy during parts of the interview (cf. Docket No. 32, Def. Atty. Decl. ¶¶ 19,

24, arguing that the statement was involuntary because of defendant's condition on his pain

medication).  Despite missing his morning dosage and later taking that medication during the

course of the interview, defendant had the wherewithal to decline to cooperate with the federal

investigation of Dr. Vazquez.  This Court notes that defendant's disposition during his testimony

on June 1, 2017, before and after he took his regular dosage of pain medication (see Docket

No. 165, June 1, 2017, Tr. at 53-54; see also Docket No. 134, Oct. 27, 2016, Tr. at 14-15

(Provost); Docket No. 156, Mar. 8, 2017, Tr. at 58 (Ortiz noting defendant appeared to have just

awakened)) had not changed.  Defendant asserted his right to the advice of counsel before

agreeing to wear a recording device <u>after</u> he took his late morning dosage on May 9, 2012. Defendant appeared to be drowsy at the start of the interview after being awakened by these agents.

Furthermore, defendant had sufficient faculties to want to confer with his counsel prior to agreeing to participate in the Vazquez investigation, <u>cf.</u> <u>Siddiqui</u>, <u>supra</u>, 699 F.3d at 707 (although defendant was hospitalized, restrained, and in pain, his statements held to be voluntary where defendant was lucid and able to engage agents in coherent conversation and agents' conduct was not overbearing). Defendant's will was not overborne and agents did not take advantage of his physical condition to coerce his statement. In his subsequent affidavit in support of the original suppression motion (Docket No. 32, Ex. B, ¶ 5), defendant admits that he expressed consent to questioning about Dr. Vazquez, with the disclaimer that he would not have consented had he known he was the target of the investigation and had he known of the arrest warrant (<u>id.</u>; <u>see</u> Docket No. 169, Gov't Memo. at 19). Defendant was detained by being surrounded by law enforcement officers inside his living room, throughout his house, and outside his home, for up to two hours until he declined to participate further without the presence of counsel. No physical force was used upon defendant or his family. The questioning (if even considered "questioning") sought his cooperation in investigating Dr. Vazquez, and did not seek incriminating statements from defendant. Defendant, as a now retired police officer of 20 years' experience at the time of the interview (Docket No. 169, Gov't Memo. at 19), has sufficient prior experience in the criminal justice system to know when he was undergoing custodial interrogation, and knew whether he was waiving his rights in agreeing to talk with the agents, <u>see</u>, <u>e.g.</u>, <u>Funderburk</u>, <u>supra</u>, 492 F. Supp.2d at 270 (citing cases).

31

Defendant thus made a voluntary statement following being advised of his rights either at the start of the interview or at the end of the interview (as defendant testified).  Since this interview was not express questioning or its functional equivalent, <u>Miranda</u> warnings need not have been given to defendant.

Defendant's motion to suppress his statements for not advising him of his rights (Docket No. 94) should be **denied**.

C.      The Effect of Garrity v. New Jersey

Defendant argues that he was in effect coerced to cooperate and answer agents' questions because of his police training.  In that training, defendant claims that he was taught to cooperate with all investigations.  Coupled with one IAD officer and one superior Buffalo Police Department official present during his questioning (and another Buffalo Police officer in his house during that interview) defendant points out that he was not advised of his rights under <u>Garrity</u> (Docket No. 165, June 1, 2017, Tr. at 22).  Defendant concludes that he was presented with the choice of either cooperating with the federal investigators or loss of his job.

In <u>Garrity</u>, <u>supra</u>, 385 U.S. at 496-97, the threat of removal from public office if defendant failed to cooperate to induce defendant to forgo the privilege against self-incrimination rendered that statement involuntary and hence inadmissible.  The "fear of being discharged under [New Jersey public employment forfeiture statute] for refusal to answer on the one hand and the fear of self-incrimination on the other hand was 'a choice between the rock and the whirlpool,'" <u>id.</u> at 496 (quoting <u>Stevens v. Marks</u>, 383 U.S. 234, 243 (1966), quoting in turn from <u>Frost & Frost Trucking Co. v. Railroad Comm'n</u>, 271 U.S. 583, 593 (1926)).  Justice William O. Douglas for the majority here writes about the "subtle pressures" that may be inflicted with the choice of

32

cooperation or self-incrimination, 385 U.S. at 496, concluding that statements obtained by this choice "were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary," id. at 498 (footnote omitted). "Where the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other," id. Justice Douglas posed the question as "whether a State, contrary to the requirements of the Fourteenth Amendment, can use the treat of discharge to secure incriminating evidence against an employee," id. at 499 (emphasis in original). He then concluded that "policemen, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights," id. at 500, and "there are rights of constitutional stature whose exercise a State may not condition by the exaction of a price," id.

Garrity arose from a New Jersey investigation of police officers fixing traffic tickets. Before questioning, each appellant in that case was advised that anything said might be used against him in a criminal proceeding and that he had the privilege to refuse to answer, but refusal to answer would subject him to removal from office pursuant to state statute. The appellants later were convicted but argued that their statements were coerced because if they refused to answer they would have lost their jobs. Id. at 494. Those officers thus were expressly told that failure to answer would result in their termination. Thus, Garrity comes into play when police officers or other public officials are interrogated, with the additional loss of their livelihood if they fail to answer questions.

Assuming that defendant was being interrogated here (and rejecting the recommendation above that no "custodial interrogation" for Miranda purposes occurred), agents never expressly told defendant that if he did not cooperate in the FBI investigation that he would be terminated.

33

Agent Provost testified to the exact opposite—that no such termination would occur (regardless of whether Provost had the authority to make such a representation). Rather, defendant extrapolated from his prior police training and inculcation that he was to cooperate with investigations and the presence of IAD and supervisory police officials that if he did not cooperate here, he faced job consequences. Nevertheless, the FBI agents did not tell him this, delinking the federal investigation of Vazquez from defendant's employment with the Buffalo Police Department, and the Police officials present remained silent. While agents and Buffalo Police officers did not advise defendant of his rights under Garrity, they also did not threaten his continued public employment if he failed to cooperate with the federal authorities.

Defendant concedes that none of the officers or agents "explicitly threatened" defendant with the loss of employment if he did not assist the investigation, but he argues that such an express threat is not required because defendant's training informed him that failure to cooperate would have consequences (Docket No. 170, Def. Post-Hearing Memo. at 13-14, citing United States v. Friedrick, 842 F.2d 382, 395 (D.C. Cir. 1988) (suppress statements if defendant subjectively believes that his statements were compelled). The Second Circuit, however, holds that explicit threats to employment **are required** for Garrity to apply, United States v. Johnson, No. 97-1231, 1997 U.S. App. LEXIS 36363, at *5 (2d Cir. Dec. 30, 1997) (summary Order)(citing favorably United States v. Indorato, 628 F.2d 711, 716 (1st Cir. 1980)), cert. denied, 523 U.S. 1128 (1998) (Docket No. 169, Gov't Memo. at 9); see also United States v. Stein, 440 F. Supp.2d 315, 328 & n.67 (S.D.N.Y. 2006) (an employee claiming a statement was coerced by a threat of termination must demonstrate that belief that termination would follow a refusal to speak was objectively reasonable and subjectively held, citing Friedrick, supra,

34

842 F.2d at 395). The Government distinguishes this Circuit's position from that of the

D.C. Circuit (as held in Friedrick, supra, 842 F.2d 382) and some other circuits (id. at 9 n.1).

Under the Second Circuit's precedent, defendant needs to show that he was explicitly

threatened with loss of his job if he did not cooperate in this federal investigation, Johnson,

supra, 1997 U.S. App. LEXIS 36363, at *5, and he was not so threatened. As a result, Garrity

does not apply here. The silent presence of Buffalo Police officers, supervisory and IAD, when

defendant was asked to cooperate is not enough in this Circuit to invalidate his statement on self-

incrimination grounds. The stark choice of "the rock or the whirlpool" was never expressly

given to defendant here. Instead, defendant inferred the dilemma from his training and seeing

the Buffalo Police officials in the interview. As noted above for Miranda analysis, defendant's

statements were voluntary and "not the product of a will overborne by threats or pressure,"

United States ex rel. Sanney v. Montanye, 500 F.2d 411, 416 (2d Cir. 1974); with employment

pressure in this Circuit being expressly applied. Defendant's motion to suppress his statements

(Docket No. 94, Ex. C) should be **denied**.

IV.    Suppression of Evidence under the Fourth Amendment

Defendant contends that the Government searched his premises without a search warrant

during his arrest and questioning. He argues that officers entered without his consent. The

Government denies that a search was conducted or any evidence seized. An ancillary issue is

defendant's motion for production of the items seized from the search (Docket No. 94, Def. Atty.

Decl. ¶¶ 46-47).

The Government also argues that nothing was actually seized. The prescription bottles

were taken and observed by the agents but returned to defendant. The agents could have

recorded information contained on those bottles, such as the name of the pills they purportedly contained, who prescribed them, the dosage prescribed.   Those pieces of information could be used against defendant despite the agents returning the bottles to defendant.

Since the prescription vials were returned to defendant, there is no physical item to produce.  Therefore, defendant's motion (Docket No. 94) to produce what he actually received should be **denied**.  What should be produced is whatever notes the agents took from reviewing the vials before they returned them, to see what prescription information from the vials the agents recorded from the vials.  It would be that information that would be subject to suppression rather than the physical vials, since the latter were returned and would be in defendant's possession (assuming if he still retains them).  As a result, defendant's motion to compel production of the information obtained from the returned prescription vials (id.), that is, the agents' notes from their review of the vials, is **granted**.

## CONCLUSION

Based upon the above, it is recommended that defendant's motion for various dispositive relief (Docket No. 94) be decided as follows:  his motion to dismiss the Superseding Indictment be **denied**; his motion to dismiss the original Indictment's mail fraud count should be **granted with prejudice**; his motion to suppress his statements should be **denied**; and his motion to suppress evidence seized during an unconstitutional search should be **denied**.  His motion, however, for production of the seized prescription bottles, now deemed to be a motion to compel production of the agents' notes of information gleaned from those bottles (seized but later returned to defendant) (id., Def. Atty. Decl. ¶¶ 46-47) is **granted**.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) (effective December 1, 2009) and W.D.N.Y. Local Civil Rule 72.3(a).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material, which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority."  **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

SO ORDERED.

_/s/ Hugh B. Scott_

Hon. Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
October 23, 2017