UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                                                                 **Hon. Hugh B. Scott**

v.                                                     **12CR214S**

                                                  **Report**
                                                      **&**
                                              **Recommendation**

ROBERT QUINTANA,

                              Defendant.

---

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(C) (Docket No. 13; see also Docket No. 184). The instant matter before the Court is so much of defendant's motion to suppress his statements (Docket No. 94). Familiarity with the previous Report & Recommendation (Docket No. 174) and Judge William Skretny's Order (Docket No. 184) is presumed. Relevant to the remanded proceedings herein is the first Report and Recommendation denying defendant's motion to suppress (Docket No 174, Report at 22-32). In that Order, Judge Skretny accepted in part that first Report (in granting defendant's motion to dismiss the original Indictment charging mail fraud and denying his motion to dismiss the Superseding Indictment) but accepted in part defense Objections (Docket No. 177). Judge Skretny posed two fact issues that needed to be resolved before deciding defendant's pending motion to suppress his statements. First, when was defendant advised of his Miranda[1] rights

---

[1] Miranda v. Ariz., 384 U.S. 436 (1966).

during the interrogation conducted on the morning of May 9, 2012, and second "if appropriate" to reexamine, whether defendant's statements and waiver of any rights were voluntary under the totality of circumstances (Docket No. 184). Further findings are due by **March 6, 2018** (id. at 5 and ¶ 7).

After this remanding Order, this Court held a status conference on February 7, 2018 (Docket Nos. 185, 186 (minutes)). The Government stated that the record was complete but defense counsel was to report his position on whether a hearing was required by February 8, 2018 (Docket No. 186) and he requested a reopened hearing (Docket No 187). A further status conference was held on February 21, 2018 (Docket Nos. 188, 189 (minutes)). The parties argued whether this Court should reopen the hearing (Docket No. 189). Defendant wanted to resume testimony, proposing to testify himself for about a half hour as to his condition during the May 9, 2012, interview. Defense counsel[2] pointed out additional factors and made a proffer regarding defendant's medication (Lunesta) he had taken on the night of May 8, 2012, and the possible interaction of that medication with the usual pain medication he did not take at first that next morning, suggesting that this may have caused defendant's stated drowsiness when agents arrived on May 9. Defense counsel also suggested additional legal arguments that could be raised and concluded that this Court resume the hearing (see id.). The Government objected, urging this Court to rest only on the existing record in making the required findings (id.). The Government later submitted its written objection to reopening the hearing (Docket No. 190; see Docket No. 189). This Court then reserved decision on whether the hearing would be reopened.

---

[2]Herbert Greenman, Esq., of counsel to his partner, Barry Covert. Mr. Covert was on trial before Judge Wolford on February 21, 2018, in an unrelated prosecution.

This Report first determines the procedural question whether that hearing would be reopened.

**PROCEDURAL BACKGROUND**

The Superseding Indictment (Docket No. 86) charged defendant (a retired Buffalo police officer) with 45 counts of wire fraud, in violation of 18 U.S.C. § 1343, for wire transmission of deposits from the City of Buffalo into defendant's bank account of salary from July 2010 to April 2013, earned while defendant was on injured on duty (or "IOD") status. It is alleged that defendant was working other jobs while on IOD duty and hence committed fraud in obtaining continued payments of his police department salary. (Docket No. 86, Superseding Indict.)

Defendant moved to suppress statements he made on May 9, 2012 (Docket No. 94). A suppression hearing was held over five days between October 2016 and June 2017 at which defendant and law enforcement officers testified (Docket Nos. 134, 156, 158, 164, 165).

Judge Skretny held that "the questioning that took place at Quintana's residence on May 9, 2012 was an 'interrogation' for purposes of Miranda" (Docket No. 184, Order at 2, ¶ 3). Thus, when defendant was advised of his Miranda rights becomes a pertinent question, requiring a credibility assessment (id.). Judge Skretny remanded this matter back for this Court "to make a determination regarding the timing of the Miranda warning" (id. at 3, ¶ 4) and to determine whether defendant voluntarily waived his rights, despite his condition during the May 9 questioning (id. at 4 ¶ 6). Judge Skretny concluded that "a determination of voluntariness cannot rest on Quintana's demeanor during his testimony. Accordingly, [the Court] requests that, if appropriate, the Magistrate Judge reexamine his voluntariness determination on remand" (id.).

**DISCUSSION**

I.     Reopen Hearing

Judge Skretny remanded this motion for this Court to make factual findings on two questions, when was defendant advised of his rights and "if appropriate" reexamine the voluntariness determination made in the initial Report (id.).  Upon consideration of the arguments made to date, review of the existing record, and the time provided to render findings, defendant's requested hearing (see Docket No. 187) **is not necessary here**.  From the extensive hearing and evidentiary record from the five days of testimony already held (cf. Docket No. 190), this Court can determine from that record when defendant was advised of his Miranda rights and whether (given the totality of circumstances on May 9, 2012) defendant's statements were voluntary.  This is a limited remand and not an invitation to consider new arguments or legal theories not advanced in the original motion.

II.    Timing of Miranda Warning

Pertinent to the remand and the remaining issues in this motion, the parties dispute when law enforcement agents administered Miranda warnings to defendant.  Officers arrived at defendant's home at 7 am on May 9, 2012, knocking at the door (Docket No. 134, Oct. 27, 2016, Tr. at 7; Docket No. 158, Mar. 20, 2017, Tr. at 50, 67).  Defendant answered the door wearing only his boxer shorts and a t-shirt, appearing sleepy (Docket No. 134, Oct. 27, 2016, Tr. at 7; Docket No. 156, Mar. 8, 2017, Tr. at 31, 58; Docket No. 165, June 1, 2017, Tr. at 15, 17, 23; Docket No. 170, Def. Post-Hearing Memo. at 4, 8-9).  Defendant testified that this drowsiness was due to pain medication he was taking, that it made him like a "zombie" (Docket No. 156, Mar. 8, 2017, Tr. at 42; Docket No. 170, Def. Post-Hearing Memo. at 7).  He claimed that he

4

slept through the time for his scheduled morning dosage of pain medication (Docket No. 165, June 1, 2017, Tr. at 16; Docket No. 170, Def. Post-Hearing Memo. at 8). Defendant testified that he felt dizzy and woozy since he missed this scheduled dosage by about an hour (Docket No. 170, Def. Post-Hearing Memo. at 10-11; Docket No. 165, June 1, 2017, Tr. at 28-29 (defendant)).

Federal Bureau of Investigation ("FBI") special agent Thomas Provost, however, never asked if defendant was affected by his pain medication (Docket No. 156, Mar. 8, 2017, Tr. at 45), or whether he could proceed with the interview despite first needing the morning dose and after receiving it (Docket No 170, Def. Post-Hearing Memo. at 7). Provost testified that he attributed defendant's grogginess to being just awakened (Docket No. 134, Oct. 27, 2016, Tr. at 11; Docket No. 156, Mar. 8, 2017, Tr. at 45; Docket No. 170, Def. Post-Hearing Memo. at 7). During the questioning, defendant took his overdue pain medication (Docket No. 169, Gov't Memo. at 8; Docket No. 134, Oct. 27, 2016, Tr. at 14 (Provost); Docket No. 165, June 1, 2017, Tr. at 15-16 (defendant)).

The Government initially contended that defendant's demeanor was unchanged after taking that medication (Docket No. 169, Gov't Memo. at 8; see Docket No. 134, Oct. 27, 2016, Tr. at 11, 14-15; Docket No. 156, Mar. 8, 2017, Tr. at 58), hence he voluntarily waived his rights (Docket No. 169, Gov't Memo. at 18-19). Defendant, however, argued that (at least at the start of the interview, before his morning dosage), he appeared to feel like a zombie due to his pain medication (Docket No. 156, Mar. 8, 2017, Tr. at 42; Docket No. 170, Def. Post-Hearing Memo. at 7).

5

Defendant then asked if he could be allowed to get dressed and the agents agreed (Docket No. 134, Oct. 27, 2016, Tr. at 7; Docket No. 169, Gov't Memo. at 7). At the start of the interview and prior to defendant dressing, agents asked if he would talk with them, and defendant agreed (Docket No. 134, Oct. 27, 2016, Tr. at 7; Docket No. 169, Gov't Memo. at 7 (while defendant was changing he was asked if he wanted to be interviewed)). Defendant, however, contends that he was in his boxers and t-shirt during the first fifteen minutes of the interview and had to be escorted by an agent to his room to get dressed (Docket No. 170, Def. Post-Hearing Memo. at 10; Docket No. 165, June 1, 2017, Tr. at 24-25).

Provost testified that he informed defendant of the arrest warrant and advised defendant of his rights at the outset of the interview (Docket No. 134, Oct. 27, 2016, Tr. at 7, 9-10, Gov't Ex. 1 (copy of rights card); Docket No. 156, Mar. 8, 2017, Tr. at 31-32; Docket No. 164, May 8, 2017, Tr. at 9-10; Docket No. 169, Gov't Memo. at 7; Docket No. 170, Def. Post-Hearing Memo. at 4, 6). Provost and FBI agent David Budz interviewed defendant (Docket No. 156, Mar. 8, 2017, Tr. at 44 (Provost); Docket No. 158, Mar. 20, 2017, Tr. at 10 (Budz); Docket No. 170, Def. Post-Hearing Memo. at 5). Agents asked defendant if he would agree to cooperate in their investigation but defendant declined to say without the assistance of counsel, which Provost confirmed was defendant's invocation of his right to counsel (Docket No. 134, Oct. 27, 2016, Tr. at 15; Docket No. 169, Gov't Memo. at 8).

Based upon Budz's actions while defendant dressed, defendant began to suspect that he was the target of the investigation (Docket No. 170, Def. Post-Hearing Memo. at 10; Docket No. 165, June 1, 2017, Tr. at 25-26). Defendant entered his living room and Provost, Budz,

6

Buffalo Police Lieutenant Dawn Kent[3], and Deputy Commissioner Charles Tomaszewski followed (Docket No. 170, Def. Post-Hearing Memo. at 9; Docket No. 165, June 1, 2017, Tr. at 18-19 (defendant)).

After Provost claims that he read from the Miranda card (Docket No. 134, Oct. 27, 2016, Tr. at 9-10 (Provost); Docket No. 169, Gov't Memo. at 7), defendant then refused to sign written waivers (in English and Spanish) of his rights (Docket No. 164, May 8, 2017, Tr. at 10-11 (Kent); Docket No. 156, Mar. 8, 2017, Tr. at 38, 40-41 (Provost); Docket No. 170, Def. Post-Hearing Memo. at 6-7).

Defendant testified that the first time he learned of his rights was later after he refused to wear a wire when he next visited his doctor and had invoked his right to counsel (Docket No. 165, June 1, 2017, Tr. at 38-40. 20, 22; Docket No. 170, Def. Post-Hearing Memo. at 11-12; see also id., at 9, 4 n.2).  He claims this was hours later from the start of the interview.

The two remaining issues in dispute are whether defendant was advised of his Miranda rights at the beginning of the interview or almost two hours later as he contends (Docket No. 170, Def. Post-Hearing Memo. at 2) and the voluntariness of any statements he made under the circumstances here.  As defendant noted in his initial Motion (Docket No. 32, Def. Atty. Decl. ¶ 14; see Docket No. 94, Def. Atty. Decl. ¶ 33 (adopting this argument in the pending Motion)), under Miranda, supra, 384 U.S. at 479, the Fifth and Fourteenth Amendments' prohibition against self-incrimination "required that custodial interrogation be preceded by advice to the defendant that he has the right to remain silent and to the presence of counsel" (id.).

---

[3]See Docket No. 164, May 8, 2017, Tr. at 3 (Captain Kent testified that she was a Lieutenant in 2012).  She and Tomaszewski are hereinafter referred to by their 2012 ranks.

To warrant suppression, the statements had to have been made in custody, without a suspect being advised of his rights to remain silent or await counsel, and without the suspect knowingly and voluntarily waiving those rights.

Defendant argues that he was advised of his rights only after he was placed under arrest, about two hours after the agents and police officials arrived, claiming that another, younger agent advised him of those rights. He emphatically denied being advised of his rights sooner or by agent Provost (Docket No. 165, June 1, 2017, Tr. at 20), stating that he was advised of his rights by an unnamed, approximately 30-year-old agent after defendant was handcuffed (id. at 39).

From the FBI's report of the arrest in the FD-302 report, agents Provost and Budz recorded that defendant was arrested at his home, with the agents arriving there at 7:05 am (Docket No. 94, Ex. C, at 1). After defendant got dressed, defendant was informed that an arrest warrant was issued against him to arrest him for health care fraud and mail fraud arising from his IOD status (id.). Defendant then indicated that he was willing to be interviewed (id.). Provost wrote that he then advised defendant of his Miranda rights from an advice of rights form FD-395a (id.; see Docket No. 134, Oct. 27, 2016, Tr., at 9-10, Gov't Ex. 1). Defendant "acknowledged that he understood his rights and was willing to speak with" the agents without a lawyer present (Docket No. 94, Ex. C, at 1). Defendant then rendered his statement and the agents sought defendant's cooperation in investigating Dr. Vazquez (id. at 1-3). As the interview proceeded, defendant indicated that he wanted to cooperate with the Vazquez inquiry but defendant wanted his attorney present first; the agents asked if defendant was invoking his right to counsel at that time and defendant said that he was (id. at 3). According to the FBI report, the

8

interview then was terminated and defendant was handcuffed and transported to federal Court (id.).

Thus, from the near contemporaneous (recorded May 15, 2012, from the May 9, 2012, arrest, id.; see Docket No. 169, Gov't Memo. at 14) statement, defendant was advised of the arrest warrant and his Miranda rights early in the interview. When first approached (before defendant was dressed), defendant had not been advised of his rights. Defendant then was under the impression that he was not the target of the investigation or a suspect. While defendant agreed to proceed with the interview before being advised formally of his rights, according to the report he was soon advised of those rights and was advised before he rendered his statement that he seeks suppressed.

Agent Provost testified consistent with this FD-302 report. Agent Budz, however, did not recall the interview and had his recollection refreshed with that report (Docket No. 158, Mar. 20, 2017, Tr. at 9-17, admitting report as Budz's past recollection recorded, at 17-20, Budz's limited recall, 20; see also Docket No. 169, Gov't Memo. at 14 n.3). Defendant's version of the interview put the service of the arrest warrant and advice of rights near the end of the almost two hour of questioning.

To make the finding as to when defendant was advised of his rights, this Court also reviewed the testimony of other agents or police officers present at defendant's home on May 9, 2012. Then-Deputy Commissioner Tomaszewski testified that he entered defendant's home with agents and other officers and was the last officer to enter. When Tomaszewski entered, defendant was already "in custody, I guess." (Docket No. 165, June 1, 2017, Tr. at 6.) Tomaszewski was present also as a liaison between the Buffalo Police Department and the FBI

9

(id. at 4), to answer questions (id. at 5), and he was present at the insistence of the Police Commissioner to locate the defendant (id. at 6). His role once entering defendant's house was to make sure defendant was "in their hands and that was really it" (id. at 9). Asked if he observed anyone read Miranda warnings to defendant, Tomaszewski said that he did not (id. at 10). From memoranda of the incident, Tomaszewski testified that agents entered at 7 am but he did not remember when defendant was arrested, and that it possibly occurred about an hour or later (id. at 10-11). During that hour or so Tomaszewski was present he did not observe warnings being administered to defendant (id. at 11). Tomaszewski testified that he was gone before defendant dressed (id.) or before defendant answered questions (id. at 11-12).

Lieutenant Kent testified that she did not participate in the interview (Docket No. 164, May 8, 2017, Tr. at 9). While standing near the entrance to defendant's home and saw defendant "engaged in conversation, I believe, with one of the FBI agents," Kent says that she was not present when defendant was advised of his rights (id. at 8, 9). She also did not speak to defendant (id. at 9).

Buffalo Police Lieutenant Richard Ortiz testified that he did not interview defendant, he was not in the room during the FBI interview, and that he could not hear the exchange between defendant and the agents (Docket No. 156, Mar. 8, 2017, Tr. at 57). Lieutenant Ortiz denied giving defendant a Miranda or Garrity warning (id. at 68).

The FBI agents who testified were not inside the house during the interview (Docket No. 158, Mar. 20, 2017, Tr. at 30 (Humphrey), 54-55 (Rains)) or were not present when defendant was read his rights (id. at 65 (FBI agent Steven Halter)). Agent Luke Humphrey transported defendant from his house (Docket No. 158, Mar. 20, 2017, Tr. at 30) with Agent

Allan Rains (id. at 44).  He did not recall defendant being read his rights or being shown any waiver of rights form (id. at 38, 44) or recall Agent Rains advising defendant (id. at 44).  Rains also denies reading defendant his Miranda warnings (id. at 55).

The Government argues that defendant was Mirandized early in the interview and that he voluntarily answered their questions and then declined to cooperate with the investigation (Docket No. 169, Gov't Memo. at 1-2, 4; Docket No. 95, Gov't Memo. at 13).  The Government discounts defendant's recollection based upon defendant's state during the initial portion of the interview, admittedly groggy from just waking up and under the effects of pain medication coupled with the passage of time from May 2012 to June 2017 when defendant testified (Docket No. 169, Gov't Memo. at 15-17).  The Government now argues that plaintiff's condition during the June 2017 hearing (where he took medication) is moot and not relevant to determining the voluntariness of his statements in May 2012 (Docket No. 190, Gov't letter at 2; but cf. Docket No. 165, June 1, 2017, Tr. at 53 (defendant admitting that taking Suboxone did not interfere with his ability to understand and testify)).  The Government disputes defendant's claimed incoherence in his affidavit (Docket No. 32, Def. Aff.) as compared with his latter testimony (Docket No. 169, Gov't Memo. at 17, citing Docket No. 165, June 1, 2017, Tr. at 17, 32).  Cautioned, however, by Judge Skretny's Order (Docket No. 184, at 4, ¶ 6), this Court will not consider defendant's medication (and his state thereunder) on June 1, 2017, to determine either his condition on May 9, 2012, or his credibility.  Such an analysis would require more extensive fact finding (see also Docket No. 190, Gov't letter at 2) that is not afforded by the March 6, 2018, findings deadline.  Absent a fuller record as to what medication defendant had taken either on May 9, 2012, or on June 1, 2017, or the effects of either set of medications had on him,

11

comparison of defendant's demeanor before or after taking that medication on the latter date will not be noted (cf. Docket No. 184, Order at 4, ¶ 6).

Thus, the timing question is a determination of credibility between defendant and agent Provost (see also id. at 3, ¶ 4). This Court finds that **Agent Provost** is more credible; he advised defendant of his rights **just after he got dressed**. The Government's own proposed Findings of Fact (Docket No. 169, at 7) states that agents asked if defendant wished to be interviewed and defendant agreed to do so before being advised of his rights. Once defendant returned dressed and entered his living room, Provost advised him of his Miranda rights (see id.).

III. Voluntary Waiver of Rights

The next issue is whether defendant, under these circumstances, voluntarily waived his right to remain silent and the other rights incorporated in the Miranda warning. An accused may waive his or her rights, Edwards v. Arizona, 451 U.S. 477, 482 (1981); Miranda, supra, 384 U.S. at 444; United States v. Funderburk, 492 F. Supp. 2d 223, 270 (W.D.N.Y. 2006) (Foschio, Mag. J.) (Amended Report & Rec.), adopted, id., 492 F. Supp. 2d at 228 (Arcara, Ch. J.). As discussed by Magistrate Judge Foschio in Funderburk,

> "In making this determination, the court considers whether the purported waiver was voluntary and constituted "a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case including the background, experience and conduct of the accused." (internal quotation omitted). Edwards, 451 U.S. at 482 (citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). "Thus, the determination whether statements obtained during custodial interrogation are admissible is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." Fare v. Michael C., 442 U.S. 707, 724–25 (1979).

Funderburk, supra, 492 F. Supp. 2d at 270.

12

As noted by Judge Skretny (Docket No. 184, Order at 3-4, ¶ 5), "the government has the burden of proving by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of defendant's Miranda rights. See United States v. Gaines, 295 F.3d 293, 297 (2d Cir. 2002)" (id.). This Court determines the voluntariness of a defendant's statement in this circumstance by a review of the totality of the circumstances. Factors include looking at the suspect's age, level of education, whether the Miranda warning was given (as was discussed above), the length of detention, the nature of the interrogation, and use of physical punishment, the suspect's mental vulnerability, United States v. Siddiqui, 699 F.3d 690, 707 (2d Cir. 2012). Another factor is the defendant's prior experience with the criminal justice system, United States v. Watson, 423 U.S. 411, 424-25 n.14 (1976) (Docket No. 169, Gov't Memo. at 18; see also Docket No. 170, Def. Post-Hearing Memo. at 20-21), including experience as a law enforcement officer administering the warnings before becoming a suspect himself.

Defendant was a middle-aged man (there was no testimony as to his date of birth or age, but he testified that he recently retired from the Buffalo Police Department after 24 years of service (see Docket No. 165, June 1, 2017, Tr. at 14-15)). Awakened when agents and police officers entered, defendant claimed that he missed a dosage of his pain medication and that made him dizzy and groggy, taking his morning dosage later during the interview period. He also stated that he did not realize what was going on, and it did not appear at first that he was a target of an investigation. He testified that he had the mistaken belief that he was not the suspect (see Docket No. 177, Def. Obj. to R&R at 3-4), that he was being interviewed to assist in the investigation of his doctor, Dr. Vasquez.

13

Defendant refused to sign the waiver of rights form. At that point and after two hours, defendant appears to have had sufficient faculties to want to confer with his counsel prior to agreeing to participate in the Vazquez investigation, cf. Siddiqui, supra, 699 F.3d at 707 (although defendant was hospitalized, restrained, and in pain, his statements held to be voluntary where defendant was lucid and able to engage agents in coherent conversation and agents' conduct was not overbearing). Defendant's will was not overborn and agents did not take advantage of his physical condition to coerce his statement. In his subsequent affidavit in support of the original suppression motion (Docket No. 32, Ex. B, ¶ 5), defendant admitted that he consented to answer questions about Dr. Vazquez (id.). Defendant gave the disclaimer that he would not have consented had he known that he was the target of the investigation (id.; see Docket No. 169, Gov't Memo. at 19).

The waiver has to be a knowing as well as voluntary waiver to be effective, see, e.g., Edwards, supra, 451 U.S. at 482 (see also Docket No. 184, Order at 4, ¶ 5). The direction of defendant's conversation with the agents was an investigation of Dr. Vasquez and not focused on defendant's own culpability. The intentions against defendant were not stated until just before he invoked his right to stop talking and for the assistance of counsel, leading to his arrest and removal in custody.

Defendant was detained by being surrounded by law enforcement officers inside his living room, throughout his house, and outside his home, for up to two hours until he declined to participate further without the presence of counsel. Defendant then was arrested. No physical force was displayed or used upon defendant or his family. At one point, agents allowed his wife and daughter to leave their home to go to school or work (advised only to not discuss the

14

investigation).  The questioning sought defendant's cooperation in investigating Dr. Vazquez, and did not appear to seek incriminating statements from defendant (but cf. Docket No. 184, Order at 2, ¶ 3 (questioning here held to be interrogation)).  Defendant, a now retired police officer of 24 years' experience at the time of the interview (Docket No. 165, June 1, 2017, Tr. at 15; see Docket No. 169, Gov't Memo. at 19), has sufficient prior experience in the criminal justice system to know when he was undergoing custodial interrogation and knew whether he was waiving his rights in agreeing to talk with the agents, see, e.g., Funderburk, supra, 492 F. Supp. 2d at 270 (citing cases).  As he realized that he was the suspect in the investigation, defendant declined to cooperate and invoked his right to counsel.

While the presence of an IAD officer and a supervisory police official during the interview may be coercive, Provost expressly told defendant that the underlying investigation was not an internal affairs investigation and that defendant's choice to cooperate with this federal investigation would not impact on his employment with the department (see Docket No. 169, Gov't Proposed Findings of Fact at 7).  As noted in the first Report (Docket No. 174, at 32-35), the stark "rock or the whirlpool" choice discussed in Garrity v. New Jersey, 385 U.S. 493, 496 (1967), was not present here since defendant's job with the police department was never explicitly threatened if he failed to cooperate, cf. United States v. Johnson, No. 97-1231, 1997 U.S. App. LEXIS 36363, at *5 (2d Cir. Dec. 30, 1997) (summary Order).  Agents never told defendant that failure to cooperate in the Vasquez investigation would lead to his termination.  Agent Provost testified to the exact opposite—that no such termination would occur (regardless of whether Provost had the authority to make such a representation).  Rather, defendant extrapolated from his prior police training and inculcation that he had to cooperate

with investigations. The presence of IAD and supervisory police officials in defendant's home reinforced to defendant that if he did not cooperate here, he faced implicit job consequences. Nevertheless, the FBI agents did not tell him this. The Buffalo police officials were silent during the interview (with Tomaszewski only staying briefly), thus not confirming (or denying) defendant's impression. While agents and Buffalo Police officers did not advise defendant of his rights under Garrity, they also did not threaten his continued public employment if he failed to cooperate with the federal authorities. Defendant concedes that none of the agents "explicitly threatened" him with termination if he did not assist the investigation, but his failure to cooperate implicitly would have consequences (see Docket No. 170, Def. Post-Hearing Memo. at 13-14, citing United States v. Friedrick, 842 F.2d 382, 395 (D.C. Cir. 1988) (suppress statements if defendant subjectively believes that his statements were compelled)). While not requiring a Garrity warning (specific to the risk to his continued employment), this circumstances must be considered as part of the totality of the situation facing defendant when he spoke with the agents.

Considered together, defendant spoke with agents **voluntarily**. On May 9, 2012, defendant, a 24-year veteran police officer, was familiar with Miranda from his professional work (see Docket No. 165, June 1, 2017, Tr. at 42). Defendant was allowed to dress before the interview. Although groggy from what appears to be the combination of recently waking up and his medications, he had the wherewithal to follow the interview and to decline to sign a rights waiver and later to assert his right to consult with his attorney. Between the agents' entry and defendant's arrest and removal, defendant was detained for about two hours. As previously found, agents asked if defendant would talk about Dr. Vasquez and was advised of his Miranda rights. Defendant slowly realized the nature of the investigation and eventually that he was a

suspect (especially if he did not agree to cooperate with the Vasquez investigation). While not under physical threat or punishment, defendant believed he had to cooperate with the Vasquez investigation and continue to talk with the agents due in part to the presence of Buffalo Police Department internal affairs and administrative officers. Defendant, however, was not coerced into cooperating in this investigation by declining to participate and invoking his rights. Finally, the nature of the interrogation was deflected from defendant; instead of focusing on defendant's culpability, the investigation was on a different target, Dr. Vasquez. Defendant made the voluntary choice to begin talking with these agents and then terminated that conversation by invoking his right to confer with counsel before fully cooperating in the Vasquez investigation as the agents asked defendant to wear a wire.

IV.  Summary

As a result, this Court finds that defendant was advised of his Miranda rights **shortly after agents arrived at his home**. Viewing the totality of circumstances surrounding this incident, defendant **voluntarily and knowingly** waived his right to answer the agents' questions. Thus, defendant's motion to suppress his statements (Docket No. 94) should be **denied**.

## CONCLUSION

Based upon the above, it is recommended that defendant's motion to suppress his May 9, 2012, statements (Docket No. 94) be **denied**. Regarding the factual findings sought by Judge Skretny (Docket No. 184) to resolve this motion, this Court finds that **defendant was advised of his Miranda rights at the outset of the interview and (given the totality of the circumstances during that interview) he knowingly and voluntarily waived his rights**. Defendant's letter motion (Docket No. 187) to reopen the suppression hearing is **denied**.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) and W.D.N.Y. Local Civil Rule 72(b).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72(b), "[w]ritten objections to proposed findings of fact and recommendations for disposition submitted by a Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis

for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(b) may result in the District Court's refusal to consider the objection.**

SO ORDERED.

*/s/ Hugh B. Scott*
Hon. Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
February 26, 2018